and Jordan v. Teva Pharmaceutical, numbers 21-1642 and 21-2304. And we'll hear from Mr. Cole and ask him if he'd like to reserve some time. Yes, Your Honor. My name is Samuel Cole, and I represent the plaintiffs in this case. I would like to reserve some time. I would like to reserve three minutes for rebuttal. That will be granted. May it please the Court. These are state law claims. Plaintiffs allege under state law that Teva failed to adequately warn when it failed to take reasonable steps to ensure that plaintiffs or their doctors received FDA warnings. If plaintiffs or the doctors had received these warnings, plaintiffs allege, they would not have taken amiodarone, which is a very dangerous drug that is meant to treat VTAC, not atrial fibrillation, the condition these plaintiffs had. Plaintiffs pleaded that the method defendants should have used to warn consumers is by following federal regulations intended to ensure that consumers receive medication guides. But they have always been clear that they are making state law claims. As an aside, we couldn't plead that Teva should have done more than the regulations provided, or else the claims really would have been preempted under a decision called mincing, which says that they are only allowed to provide the FDA warnings. We've read the briefs. We're pretty familiar with it. So we can drill down a little bit. But something that we'd like to – a threshold matter in every one of these cases deals with jurisdiction. I don't know if you want to – Yeah, you sued a bunch of Doe defendants. And how – why don't they destroy diversity? Your Honor, I think – I don't know that with the Doe defendants, Your Honor, with respect to the Doe defendants. Yeah. Well, so in the Bennett – the only named defendant was Teva, which is diverse from the remaining plaintiffs in this case. The – and in the Bennett case, at least, there could also be jurisdiction under CAFA. We would have to amend our pleading on appeal, which you're allowed – this court has discretion to do under the federal rules to allow us to do that subject to conditions. Can the plaintiffs, though, if we – if you went the CAFA route, can they allege that they'd meet the $5 million amount in controversy? Yes, Your Honor. There are 123 plaintiffs, and most of these are wrongful death cases. And I believe – I'm not sure if it made it into the final brief, but there are decisions that indicate that a wrongful death case – you know, these are claims – this is a very painful death experience. They experience a lot of these side effects – harmful lung condition. And we would be able to plead the $5 million in total damages. Well, going back to Judge Porter's question about the Doe defendants, are they other manufacturers? Are they Teva entities? Who are these parties? Yes, Your Honor. And the reason that we did that, just to explain, is when we were doing this very early, early on, we weren't sure – we had – the plaintiffs, you know, they bring in their prescription – things that they got with their prescription, and you look at the number and see who prescribed amiodarone. Right. But in many cases, they continued – they got several prescriptions of amiodarone. If you could just answer my question, are they – are the Doe defendants other manufacturers, or are they Teva entities, or both? Yes, Your Honor. They would be other drug manufacturers who may have manufactured drugs that – amiodarone that the plaintiffs consumed but that we're not aware of at the time. Would they be necessary parties within the meaning of Federal Civil Procedure 19? I do not believe so, because Teva has failed to warn, and so the harm is caused by Teva under our complaint, even if there are other manufacturers whose drugs they consumed. Okay. So I don't think that it would be essential to resue because we could get our remedy from Teva for the harm caused by their amiodarone. Anything else on Jurisdiction Day? John? So the question I have is – that arises from this as well is, you do mention in paragraph 96 of the complaint that the defendants are citizens of Delaware. Is that a reference to these John Doe defendants as well? No, Your Honor. I think that that might have been a mistaken reference originally to Teva. Not a mistaken. I think that that was just a reference to Teva. The reason I was confused is you used the plural there. The plural, oh. I assumed that that included the John Doe defendants. Yes, Your Honor, but we do not know where the other defendants are resided because we don't – that's the reason why we did Doe pleading originally, because we think that they might have consumed amiodarone manufactured by other defendants additionally, and if they did, we wanted to be sure that we had – But the problem with that is that if you sue Doe defendants but don't allege their citizenship, it destroys diversity. Yes, Your Honor. So we had included Delaware as placeholder language for that because we are not sure which ones they are. And if it turns out they're from places like New York, New Jersey, Colorado, Delaware, places where your plaintiffs are from, it's going to destroy diversity, right? Yes, Your Honor. Well, under CAFA, with the Bennett proceeding, there are over 100 plaintiffs, so I would think that even in that case, you would still be able to reach the merits in the Bennett decision because we would be able to allege CAFA jurisdiction if the court finds it necessary for us to re-plead. So Mortallite doesn't preclude you? No. Excuse me, Your Honor? I said Mortallite, you know, Mortallite versus Novartis. Oh, Your Honor, I'm not familiar with that case. Am I not pronouncing it right? Mortell-lite? Oh. I'm pretty sure it was in the papers. Oh, Your Honor, I don't recall that specific one. That's the case that said John Doe parties destroy diversity jurisdiction if their citizenship cannot truthfully be alleged? Yes, Your Honor, and I believe that in the Bennett, at least with the Bennett proceeding, we would be able to proceed under CAFA even in light of that case. In fairness, you didn't cite it in your brief, so you're good. Yes. Okay, so you can move on to the merits. Yes, Your Honor. So defendants argue for what I would say is an alarmingly breathtaking, over-broad reading of Buckman versus plaintiffs legal committee. Of course, you're familiar with Buckman from the briefing. Defendant argues essentially that because plaintiffs claims parallel federal regulations, even exactly, we do allege that they breach the federal regulations concerning medication guide, they are preempted. But I think that that is a wrong reading of Buckman because, as this court has stated, in Felmer versus Tri-Union Seafoods, it is hard to imagine a field more squarely within the realm of traditional state regulation than a state tort-like action seeking damages for an alleged failure to warn consumers of dangers arising from the use of the products. But how do you respond then to your adversary pointing out that, look, if, you know, along the lines of Buckman and other cases, you know, if the FDA, if these regulations, federal regulations didn't apply, a lot of this would, well, frankly, a lot of what you rely upon are federal regulations. Yes, Your Honor. With respect to the medications guide and other things, you know, reporting the FDA. So, Your Honor, our reading is that you have to look to state law to determine what state law would apply. The default rule in Delaware under the Lacey decision is that there is ordinarily a duty to warn consumers directly. Now, I understand that under the Learned Intermediary Doctrine is an exception to that rule where, under certain prescription drug cases, you have to warn only the doctor. But Delaware is permitted, through its common law making authority, to recognize exceptions to the Learned Intermediary Doctrine, which, after all, is an exception itself to the general common law rule. And so how I would respond to that is that Lacey strongly, although it's technically dicta, admittedly, it strongly implies that where there is a federal duty to provide a direct-to-consumer warning, then Delaware itself would not, would, it would render the rationale of the Learned Intermediary Doctrine inapplicable. Lacey, the plaintiff in this decision, argued that the federal requirement to direct warning, to give a direct warning renders the rationale of the Learned Intermediary Doctrine inapplicable to this case. Lacey didn't quarrel with that, with that argument by the plaintiff. Instead, the court said, we hold that because Searle did, in fact, provide an appropriate warning to the consumer, it satisfied the requirement of the federal regulation. Once this requirement is met, the doctrine of the Learned Intermediary applies and acts to bar any alleged deficiency in the warning to the user. So only once that requirement is met. And to be clear, even though the requirement parallels, is related, incorporates a federal, a federal regulation, this is a state law requirement. Under defendant's reading of Butman, a state would not be able to say, well, hey, you know, the FDA is pretty smart. If they think that there is a consumer warning, we think that whenever the FDA thinks that there's a consumer warning, there should be a duty to warn the patient directly. Your duty is a pretty specific thing. We haven't seen that per se in a Delaware case, have we? And Section 388 doesn't cover this type of thing, does it? It's more general. Yes, Your Honor. It is more general. The duty, the general duty to warn is just a warning to provide, to take reasonable steps to provide an adequate warning to consumers. And I understand that there is the Learned Intermediary doctrine, which is another state law doctrine that applies in the prescription drug context. But we are appealing to this general rule, but we're narrowing it down to mirror the federal regulations so that we're not barred by the mincing decision. Because we can't say, oh, well, they should have gone above and beyond what the FDA requires and given a really great warning that's not required by the FDA. Because under the Supreme Court's decision in mincing, that would be preempted by impossibility preemption. And so there's kind of a narrow thread where we have to say, well, you violated state law. You have to get an adequate warning to the consumer and to the doctor by not complying with the FDA regulations, which would have resulted in that. You know, for instance, if the state law duty is to get package A to person B, but federal law says that you have to use Federal Express, you know, you could say, well, we had to plead that you didn't use Federal Express because that's what the federal duty requires. But generally, we're just saying that you didn't get the package from A to B. Can you give us some extra time? Yes. Yes, Your Honor. You can keep going. Oh, no. I'm done. Thank you so much. Oh, okay. Thank you. Terrific. Do my colleagues have any questions? Well, I have one. If we approach this the way the Second Circuit did in the free or fry case, under Rule 8 and Rule 9, what additional facts would you plead if you were given the opportunity to replead? We would be very clear that they did not provide the means to produce medication guides to the distributors and to the pharmacies. And that issue just, this is kind of an interesting issue because in this case, that specific argument that the fry court accepted, that the fray court accepted, was not made here. They did argue that we didn't comply with Rule 8, but that was kind of tied together with, you know, not saying the names of the pharmacies or something. The specific argument that the fray court latched onto that you didn't specifically allege that they didn't provide the means to produce medication guides was not really much at issue here. And if it had been, we would have asked for you to replead to meet that requirement. And also arguably in this case, I don't remember the fray, what the briefing was like in fray, but we did plead on Joint Appendix 329 that the defendant failed to provide medication guides and to assure its distribution in accordance with the requirements applicable. And then we quoted the federal regulation that uses the means to produce language. So I think that under a fair reading of the pleading that is alleging they didn't provide the means to produce. You didn't file a separate motion to amend the complaint, right? No, Your Honor, because we were thinking that this battle would be fought on preemption and learned intermediary grounds. And so given the way that the briefing developed, we did ask for like a generic leave to replead, but this was all happening before the fray decision was decided. And so we didn't know that that we had thought that we did plead that adequately because it's certainly what we were what we were intending. I had one question on your off-label promotion claim. It appears that what you're really asking is that the label should have been strengthened, but I didn't understand that claim because obviously a generic manufacturer is not permitted to do that. So maybe you can help me with that. Yes, Your Honor, and thank you so much for the opportunity to clarify that. We are not saying that the labeling should be strengthened beyond what the FDA requires. We were saying that they had actually they had already violated their duty of sameness by allowing this information that was already beyond what the FDA required and that that had misled doctors. So so the so the labeling led doctors to believe that there was off-label promotion. No, Your Honor. Not the labeling, but the off-label promotion that they were doing led doctors to believe that it was safe to prescribe for atrial fibrillation. I have one more preemptive question. So I understand your argument on failure to warn and the breadth of how we interpret Buckman and so on. On the failure to report adverse events claim, is there any reason why that one isn't preempted under sick leave? It's essentially a failure to it's a fraud on agency kind of claim, just like Buckman and sick leave. Yes, Your Honor. So I do think that there there is there is a difference because although that is admittedly a closer case, we are not saying that the FDA has to do anything. We're just saying that they have to send these reports to the FAERS system. And then doctors will be able to like if they look up amiodarone and the FAERS system, they will be able to see, oh, wow, there's like a lot of adverse events reports for this, a lot more than I would expect. And so that itself would have acted as an additional warning. I think that that's a little bit different from sick leave and especially from Buckman because we're not expecting the FDA to do anything at all. We're just saying that by sending that information to the FDA, we're not saying that they misled the FDA or that the FDA would take actions in response to that. We're just saying that by failing to send that information, there's one less lawful warning that doctors can receive. I just have one question. As your adversary pointed out, our colleague, Judge Schwartz, sitting as a district judge, issued an opinion, Roncow versus Urbino Pharma. You read it. You probably didn't like it. What's wrong with it? Well, so one thing that I would say is, one thing to distinguish it, is that we are at least operating under Delaware law unless the law of their home state supplies, which West Virginia didn't even recognize the learning intermediary at the time that they were prescribed amiodarone. But putting that aside, we're operating under Delaware law, and I would say that Delaware law in the, I'm trying to remember the name of the case. I'm blanking on it. Roncow? Lacy. Oh, I'm sorry. Delaware law in the Lacy case does strongly imply that the learned intermediary doctrine under Delaware law does not apply when there is a failure to warn. And also, we did disagree with the opinion, and it's similar, the reasons are similar to why we think that Buttman does not apply. The test for Buttman, as this court made very clear in Fellner, is not just whether you reference federal regulations a lot or it parallels even exactly federal regulations. Like, our claims do. We say that they didn't comply with the federal regulations regarding medication guides. But the basis for our claim and the reason why that regulation nevertheless isn't a critical element in our claim is just a common law failure to warn. The means that they should have used was the federal regulations, but that doesn't mean that it's preempted. It just means that that's our only option. Okay. Okay, thank you, counsel. We'll get you on rebuttal. Thank you. And we'll hear from your adversary. I can do this without dropping anything. It's okay. Take your time. Thank you, your honors. May it please the court. My name is Jamie Santos, and I represent the defendant Appali Teva USA. I wanted to start on the diversity question, because I think I have maybe just a kind of practical answer to it, which is that in this case, I think that the DOE defendants aren't real, true DOE defendants, as we might think of as a kind of a placeholder for someone that we're trying to figure out, that we really have in mind exists at the time. I think essentially what the plaintiffs are doing is leaving the option open to add more defendants later. And I think we don't think of those types of defendants for purposes of looking at diversity. And I'll also note that my friends on the other side, when they are suing other manufacturers, they have been generally doing so in the home state or the headquarters of that manufacturer to avoid personal jurisdiction issues. So that might be a practical but hopefully satisfying answer on diversity. How about CAFA? Is there jurisdiction under CAFA if we were to maybe deem it, the complaint amended? Your Honor, TEVA doesn't take a position on whether the plaintiffs could satisfy CAFA jurisdiction. And I'll just say, you know, I know that there are different kind of procedural prerequisites that the plaintiffs would have to go through to demonstrate that it's an appropriate CAFA case. And without actually seeing a pleading setting forth those, I just can't take a position on whether we think that this would satisfy CAFA. Your Honor, I'd like to, with that kind of dispense, I'd like to jump to Lacey, because I don't take the same view of Lacey as my friend on the other side. Lacey was kind of a strange case because the claim in Lacey was that the existence of a federal requirement should change the operation of normal state tort law. And the court actually rejected that view, adopting the learned intermediary doctrine. And to be sure, the court remarked that the defendant had satisfied its federal requirement. But it did not say that having not satisfied the federal requirement would create a violation of state law. And I think that that type of theory, that a federal requirement could create an exception to the normal operation of traditional state tort doctrine, is exactly what Buckman and Sickley prohibit. So it's seeking an exception to state tort law rather than applying traditional state tort law. I also wanted to address the Sickley issue because my friend's distinction, I don't think holds water when I read the Sickley opinion. The notion that this case is different because the FAA would have had to take action, affirmative action. First of all, the court's discussion in Sickley didn't address or discuss that at all. Second of all, that's actually not a distinction from this case, because the FDA also has to take action to make adverse events available to the public. It's not required to do so. It may do so, but it's not required to. And it only updates its adverse events database and reports every quarter or so. And to actually get any case-specific information from the FDA on these adverse events, you actually have to file a FOIA request. And if you'd like to see, you know, this wasn't really fleshed out in the briefs, but the Arizona Supreme Court's decision, Conklin v. Medtronic, talks about this particular aspect. So I don't think that that's a viable distinction. And I'll also note that Sickley's author, Judge Schwartz, applied that decision to claims that are identical to the ones here. Next, addressing the issue of amendment. On the medication guide claims, I'll note that my friend's only suggested amendment that he could offer would be to add a sentence that just parrots the language of a federal regulation. And under Twombly and Iqbal, that's not enough to state a plausible claim for relief. And also, this is, you know, this is not a situation in which it's simply a matter of inartful pleading. My friend's- Well, maybe you're answering my question, but I'm going to ask the question anyway. This wasn't really a basis that you moved to dismiss, you know, a failure to state a claim. And so is it really fair, would it be fair to affirm on inadequate pleadings at this point? Without giving them a shot to amend? Yes, Your Honor, and I'll give two reasons why. Number one, we actually did move on the failure to state a claim under Rule 8A. We had 10 pages in our motion to dismiss on this specific issue, and I think three additional pages in our reply brief. So this was one of the grounds that we moved on. It was a primary ground that we moved on. And then the second reason is, I think that this is not- But the district court didn't base its ruling on that. The district court didn't seem- didn't have a need to base its ruling on that. But, you know, if this were a case where this were simply the first on the odorant complaint that had ever been filed, then it might make sense to say, you know, maybe they didn't know what additional facts they needed, or maybe they could add some more facts. But first of all, my friend still hasn't pointed to any factual allegations beyond parroting the federal regulation that could make the claim viable. And I think the reason is that my friends on the other side could not do so consistent with their ethical obligations. And that's because in the one on the odorant case that went into discovery against Teva, the Mitchell case in Texas, my friends received discovery that showed that Teva did distribute medication guides. And when that happened, the plaintiffs changed their theory of the case and tried to argue that Teva should have ensured that patients received these guides, and the court rejected that at summary judgment. So I don't think this is a situation that they could just add more facts. And I also don't think that it's unreasonable to add, to plausibly allege some facts beyond just parroting the regulation. It would not be difficult, for example, for plaintiffs to, you know, go to their pharmacies and say, hey, I never got a medication guide. Do you know why that is? And if pharmacies said, you know, we never get medication guides from this distributor, or we never get medication guides from this manufacturer, then that could be a powerful allegation that could bear on plausibility. But I think Twombly and Iqbal prevent people from kind of going into court and suing someone for millions of dollars based on a hunch that because the plaintiffs didn't receive medication guides, that Teva, five steps up the distribution chain, failed to provide them. My friend also didn't provide any additional allegations that he could offer to bolster the failure to report claims or the fraudulent promotion claims. And even in other courts where my friends have asserted these exact same claims and they've been given numerous opportunities to amend, to add facts against Teva, they have not been able to do so. In the California Amiodarone cases, for example, my friends had, I think, three opportunities to amend, and they were even specifically asked, you know, do you have anything that you could allege against the generic manufacturers? And they said no and then abandoned their claims on appeal. And in the Frey case, Teva wasn't a defendant in that case, but in the Frey case, my friend on the other side was even asked, you know, do you have any additional facts about these failures to report beyond the statistical assumption that is made on paragraph 151 of the complaint here? And essentially he said, you know, the statistical inference is what we've got. So I don't think this is a case where if they had simply known that they had to provide more facts or had another opportunity, they could provide additional facts. Let me ask you this question. Yes. If we determine that the medication guide claim is preempted, do we need to resolve the question of whether the learned intermediary doctrine applies? I don't think so, Your Honor. I think that in many cases the two will go hand in hand because the unavailability of a viable state law claim will also mean that the claim fails under Buckman preemption. But even if, you know, the plaintiff's theory on the learned intermediary doctrine, I think at this point is the learned intermediary doctrine exists, but state law could create an exception to that doctrine if there's a federal regulation that creates a different requirement. And I think that is exactly that type of theory would still fail the critical element test under Buckman and under Sickley because it is clear that what is creating, what is making that state law claim viable is the existence of the federal requirement, a federal requirement that Congress determined should not be privately enforceable. Can I ask you a question about your adversary mentioned the sort of small thread between Buckman and Mensing. Let's say a new warning was added to a label, okay, of a brand-name drug, but the generic drug manufacturer just failed to update its labels. Under your reading of Buckman and Mensing, could the generic drug maker be sued for inadequate warnings? So that may be the subject of a circuit split, so let me give you some broad principles without kind of tying myself to one particular position. I think that what many courts, at least some courts have said, is that in that situation you still have the basic traditional state common law rule that applies, which is that you have a duty to adequately warn physicians. And where the, you know, in the Mensing situation you can't change your label because of the duty of sameness, but when you actually could have changed your label to make it stronger, Mensing doesn't play a role and there's no Buckman problem because there already is a duty to adequately warn physicians. So at least some courts have said that that would be a viable claim. There are plaintiff's allegations here, so I don't, you know, I wouldn't take a position on it. I don't think it's relevant to this case, but some courts have said that, yes. But it's sort of interesting as to whether applying your rationale, is there a spot between that a plaintiff could pursue against a generic drug manufacturer? And I think that, you know, there are other aspects of tort law doctrine that could make that type of claim tricky to be viable and to be plausible. If, for example, there's just a teeny tiny label change that one couldn't plausibly allege would have caused a different result, would have caused a doctor, you know, to make a change, then I think it would be very difficult for that claim to be viable. But that would be more as a matter of pleading rather than as a matter of preemption concerns. And I also want to just, if I can briefly mention, you know, there certainly are difficult challenges in the preemption context because of the regime that Congress chose. But we are certainly not saying that every tort law claim would be barred under Buckman. There are many different, and I can give a couple of examples if that would be helpful, to claims that I think would survive and claims that maybe wouldn't. Well, that's what I was just asking you. Yeah. Maybe I didn't do it so artfully. But go ahead. So, you know, one example of a claim that would. I guess there's a concern of are all private plaintiffs out of luck? Absolutely. You know, and so I'll say, you know, manufacturing defect claims, like the claims that were at issue in the Bausch case that my friends rely on, that type of claim would, generally speaking, survive Buckman because it has been the case for a decade or more, or for probably centuries, that if someone is injured by tainted drugs that they purchase, they can go into court and sue a manufacturer for having a tainted process. And so even though the FDA, you know, has a whole bunch of rules surrounding what you have to, what you're supposed to do in your manufacturing process, you can go into court and sue under that theory without reference to FDA regulations. Another example is that while courts have pretty uniformly held that off-label promotion kind of simpliciter is barred under Buckman because that's only a prohibition that exists under federal regulations and not under state tort law, fraudulent off-label promotion has generally, speaking, been held to not be preempted because, again, for a century or more, it has been the law that if you go out and make misstatements about your products and they cause harm, then that type of claim could survive without any reference to federal law. So it's not impossible, but, you know, there are restrictions and that's because of the regime that Congress has focused on. You know, part of Buckman, I'm sure you know this, part of Buckman is pretty closely tied to fraud on the agency and the court revisited that theme in Wyeth against Levine, again, in 2009, and then in Kansas against Garcia in 2020. Why shouldn't we read Buckman narrowly that way? Well, for one reason I would say that Sickley didn't read Buckman narrowly that way, but even putting aside Sickley, I think what the Supreme Court was doing in Buckman is it did speak about fraud on the FDA, but ultimately it was engaging in statutory interpretation and it was interpreting the preemptive force of Section 337A and many of the same concerns that were animating the court's decision in Buckman are present here. So, for example, the court in Buckman said that Section 337A gives the FDA enormous flexibility, so it can experiment with different types of rules or requirements that might advance public health and safety without worrying that doing so could lead to thousands of lawsuits and hundreds of millions of dollars of liability that's sought, which could discourage manufacturers of drug products or medical devices from coming on the market. And that concern is maybe most acute with drugs that, when used properly, can save lives, and when used improperly, can have risks that come with it. The other thing the court said in Buckman that is equally applicable here is that Section 337A gives the government discretion so that if there is an egregious regulatory violation, the FDA can pursue civil penalties and criminal penalties and take a drug off the market. But if there is a small infraction, maybe resulting from a confusion about what one of the thousands of pages of FDA regulations requires, the FDA can take a narrower action. But it is not the case that all of those errors will lead to billions of dollars in state tort liability. Thank you, Your Honors. Do you have anything else? Okay. Thank you, Counsel. Thank you so much. And we'll hear from your adversary. Take your time. Thank you. Thank you, Your Honors. So I wanted to address something really quick that I think is just crucial to this case, and it's Judge Greenaway's question about whether we need to determine state law in order to determine whether this is preempted. And we would say absolutely, unless you take an extremely broad view of Buchman. This is just by way of example, but North Carolina actually has a statute that says that the North Carolina learning intermediary doctrine is codified, and it has a statute that says that the learning intermediary doctrine applies unless the FDA requires a warning. Under their reading of Buchman, that would not be permitted. The North Carolina legislature even wouldn't be able to do this. This is a little bit confusing to me because you say rather broadly, this is a Delaware law case, but you say other states as well. What other state's law applies here? Yes, Your Honor. So the other state's law that would apply would be the home states of the plaintiffs, but that really was not briefed that much at the district court because the defendant argued that it was preempted and barred by the Delaware learning intermediary doctrine, and then just had a footnote saying that it was barred by the learning intermediary doctrine of the plaintiff's home state. And we kind of responded in kind where we mostly focused on Delaware law, but also had a footnote saying that, well, if the law of the plaintiff's home state supply, for instance, West Virginia expressly did not even have a learning intermediary doctrine at the time the West Virginia plaintiffs consumed amiodarone. And so I do think that with Buchman, well, for instance, another case in California, I believe it's the McClellan case, recognized that you can have, that a state can have negligence per se based on federal regulations. And under the other side's reading of Buchman, that would not be allowed because you would literally be making state law the same as federal law. There are just so many examples. And Buchman did rely on 337, which says that only the FDA can bring a proceeding to enforce the FDCA. But we are not trying to enforce the FDCA. We are trying to enforce state law. And to be clear, the Buchman decision was largely based on conflict preemption decisions. And it would just be interpreting Buchman that broadly would just be like an earthquake. That would be very confusing because any time you had federal regulations, well, are states allowed to do this? Can they just say, wow, those federal regulations look good. Let's adopt those as our own. I don't think so under their reading of Buchman. I think that's my time. You can finish your sentence. Oh. I don't think that that would be permitted under their reading of Buchman because they say that Buchman says that if you are making it exactly like the federal claim or having exceptions that incorporate federal law, then it's not permitted. Okay. Judge Greenlee, do you have anything more? Okay. Judge Pork? Okay. Thank you, counsel. Thank you. We will take this case under advisement. We'd like to thank counsel for the excellent briefing and argument in this interesting case. And we will ask that the court adjourn for the day. Please rise. This court stands adjourned until the week of May 9th in St. Louis.